Freeman, J.,
delivered the opinion of the Court.
The facts on which the decision in this case rests are substantially as follows:
W. C. Northcutt died intestate, in Weakley county, in February, 1864. The said Northcutt was .owner of a tract of land of 200 acres, upon which there was a grist mill, run by water, and had sold one undivided half of the land and interest in the mill to one J. G. Moore some years before his death, and he and *748 Moore were partners in the mill and tract of land on which it was situated, the mill being the basis of the partnership.
When Northcutt died, no Courts being open in the country, there could be no administration had on the estate, nor could the widow have her year's support set apart to her for herself and children.
Northcutt left surviving him bis widow, Mahala Northcutt, and six children, to wit: A. Lynch, a widowed daughter, living in the family; Jno. M. North-cutt, his eldest son, about 22 years old: Marshall J. Northcutt, Peyton Northcutt, and complainant, Virginia, who has since intermarried with Griffey, and with her husband files this bill. The children, except Mrs. Lynch and John M., were minors.
Mrs. Mahala Northcutt died April 17th, 1865 — a little more than a year after her husband — and the son Peyton died 3d April, 1865, before his mother.
Moore, the partner in the mill, continued to run the same, after the death of W. C. Northcutt, in connection with the widow — her son, Jno. M. Northcutt, being a practical miller, taking- charge of it, at request, as he proves,. of his father, on his death-bed perhaps, for his mother. This continued till death of the widow, in April, 1865, when 'Jno. M. took charge of the mill in connection with Moore, and they continued to run the same up till filing of this bill. The profits from the mill were received by Moore and Mrs. Northcutt between them, and after her death, by Moore and Jno. M. Northcutt. Mrs. Northcutt, the widow, used what she received in supporting her family *749 of orphan children, among whom was Virginia, the complainant, now Mrs. Griffey. She seems also to have paid some of the debts of her deceased husband out of the profits of the mill, the amount not necessary to be ascertained in this opinion. Jno. M., during the time he received the profits of the mill, supported his brothers and sisters, paying, as he alleges, their schooling and medical bills, and keeping up the family establishment. It is insisted, however, that he appropriated considerable sums for his own use, and paying, perhaps,. some of the individual debts of his father.
On opening of Courts again in 1865, Jno. M. North-cutt was, in October of that year, appointed administrator of his father, and entered upon the duties of his office, giving bond and security in sum of $10,000. The bill charges that Jno. M., as such administrator, received a large amount of personal property, choses in action, etc., of W. C. Northcutt’s estate, and that he used and wasted the same to his own use.
The original bill charges, that Jno. G. Moore was to pay for the undivided half of the mill tract and mill property $3,000, and had only paid about $1,100, and that the remainder, with interest, remains due, Moore holding the title bond of Northcutt for title when balance should be paid.
The bill alleges the profits to have been many thousands of dollars, and in amended bill filed is alleged to have been more than $20,000, and that the personal estate of W. C. Northcutt was ample to pay his debts. It also alleges that large sums were due *750 the mill concern for sales, both before and after the' death of W. C., and that much of the sales had not been charged on- the books.
It is alleged that Moore is insolvent, and had conveyed all his property by deed of trust, and that John M. has no personal or real property except his interest in the real estate and personal property of his deceased father, and that the bond given by him does not cover but a small portion of the amount he has received from said estate, and that he is continuing to waste daily said estate and the profits of the mill, with consent and connivance of the said Moore, and that Moore and John M. are using the largo stock of hogs for their own use and individual profit. They charge that John M. is daily wasting said estate, and complainants Griffey and wife, and the other heirs of said W. C., have no security against loss, and that the income of said mill is large, amounting to several thousand dollars annually. Peyton Northcutt died unmarried, and left complainant Virginia and' his other brothers and sisters, his only heirs at law, as is charged. During the pendency of the proceedings, George R>. Brassfield was appointed administrator of Peyton, and George IP. RauLston of Mrs. Mahala Northcutt.
The bill charges that the acts of- John M. North-cutt and J. G. Moore ai’e fraudulent and to the preju-'udice of complainants, Griffey and wife, and makes the other children, together with John M. Northcutt and said Moore, parties defendant, and requires an answer on oath from Moore and John M. as to how much *751 tbe receipts of said mill has been, including pork killed, and from every other source, how much money has been received, how much is due, and from whom, that a receiver be appointed to take chargje of the mill, and collect the moneys due said mill or the said Moore and heirs of W. C. Northcutt, and for an account of the earnings of the mill during the time it had been in possession of, and under control of, Moore and John M., and a decree against them for the same, and that Moore be compelled to pay the balance of purchase-money due on said mill, and be enjoined from handing over any of the earnings of said mill, and for general relief.
There was an amended bill filed, as we have stated, the only additional allegation of which that need be noticed is, that a saw-mill had been added to the mill establishment, and paid for out of profits of mill, and an account is prayed of the profits from this source as well as the grist-mill.
The answer of John M. sets up the matters we have stated, that he took charge of the establishment and claims a credit for moneys paid out in support of his brothers and sisters, among them complainant "Virginia; that he was at the death of his mother the oldest surviving brother, he had living with him all the children of his father; and that he sold, as shown by his inventory as administrator, the personal estate left after death of his mother, amounting to $187.35, and, as he alleges, of this property a good portion was property exempt from execution, and had gone to his mother by law, and did not in fact belong to his *752 father’s estate; and that he bought in the articles, and kept them for the joint use of himself and brothers and sisters, and has not wasted anything thus received. He claims that, during the life of his mother, he remained at the mill on wages at request of his mother and Moore, and was to receive $500 per annum for his services; and that his mother received the profits up to her death, and used them in support of her family of children and herself. He says he has continued to labor at said mill up to the present time,- and has maintained, and educated, and clothed, and fed, furnished with medical attendance and all necessaries, the members of the family, except as to complainant Virginia, who left awhile after her marriage. He admits the mill brought in a good sum as profits, but claims that its expenses were somewhat proportionate to its profits, and that, while there is a considerable amount due the mill, there is also a considerable amount owing by it for expenses incurred in running the same.
He denies that he had wasted anything of the profits of the mill, but had paid it out for legitimate purposes, in payment of the debts of his father’s estate, and for benefit of. his father’s children. He exhibits an account, showing the amount due North-cutt & Moore, that is, the said Jno. M. & Moore, up to 20th January, 1868, the time when the mill was placed in hands of receiver, under these proceedings. The amount thus due, is stated to be $5,528.85, and the amount due from profits of the saw-mill is stated to be $1,093.38.
*753 He also files an exhibit showing the amount due Northeutt & Moore, up to the death of W. C. North-eutt, and that it was $978.19; and that the said W. C. owed the firm $756.43; and that his mother had received after death of his father, $2,229; and that he, Jno. M., had received over and above his credits, out of the profits of said mill, $5,829.32; and that his mother had maintained the family out of the sum so received. He states, that he has paid out of the profits of the mill, besides supporting his brothers and sisters, the sum of $2,168.31 of debts of his father, and claims other credits for teams furnished for use of mill, and for his personal services for four years, which he estimates at $600 per annum. He denies that any sums were received and not charged on books of the mill, and ■ says the books kept at the time of the transactions, will verify his statements. • He claims that his bond is ample as security for the personal estate received by him of his father, and that as administrator he is not bound to account until the end of two years, which had not expired; and that a number of debts of his father are still due.
Moore files his answer, in which he states the facts substantially as Jno. M., and makes -it a cross bill; and says, that there is a balance due on the saw-mill unpaid of about $350, and that Jno. M. was agent of the heirs of. W. C. Northeutt, and if this is not so, the complainant is not entitled to an account of the profits of the mill, but only to one-tenth of the reasonable rents, which he says complainant has already *754 received in the way of board, education and clothing, since the death of her father.
Should the Court hold Jno. M. as agent of the other heirs, he claims that the earnings of the mill were applied in phrt to payment of W. C. Northcutt’s debts, amounting to about $700, paid by Mrs. North-cutt, and about $2,100 by Jno. M., and balance used to support family, including Virginia; and that the earnings received by "W. C. in his lifetime, by his widow after his death, and by.Jno. M. since her death, are in the aggregate in excess of what he, Moore, has received, $4,030; one-half of which should be credited on his notes for the land; and claims credit for notes of W. C. Northcutt, amounting to $400; and that since death of W. C. Northcutt, he has paid $100 for said estate in a debt due to one Vincent, at request of the administrator. He also claims interest on excess of profits in the hands of the other tenants in common, which he says will leave the estate in debt to him, after discharging land notes, in the sum of about $400, and asks a decree for said balance, and for general relief.
There are other cross bills and answers in the record that need not be noticed, some of which need not have been filed, as the relief sought by them could as well have been had under the original bill and answers as by cross bill.
In order to settlement of the complicated accounts involved in this investigation, under the facts presented in this record, we inquire, first, as to the rights and duties of Moore, the surviving partner, on the death of W. C. Northcutt in 1864.
*755 The land and mill on which it was situated were partnership property — 2 Hum., 459 — and as such subject to prior lien of partnership debts, though the legal title remained in Northcutt, and Moore only had a title bond. Equity treats that as done, which is agreed to be done, upon sufficient considerations: 7 Hum., 208.
On death of ¥m. C. Northcutt in 1864, who was entitled to the profits of the mill? It was run by the surviving partner in connection with the widow, till her death, in April, 1865.
In the leading case of McAllister v. Montgomery, 3 Hayw. R., Cooper’s ed., 95, 97, the Court first state the law before act of 1784, on death of a partner: “ How is it,” say the Court, “ if one died ? The partnership property survived, the real estate held in joint tenancy survived as in ordinary cases. That excluded the claim of the heir. The descent to him was broken and prevented; he could never claim it; it could never vest in him but by conveyance made to him by the survivor, which he had no right to claim. The survivor was to pay all debts due from the firm, to ascertain the value of what remained. He must of course have all the partnership effects to pay them with. He must have power to sell them, and how could he do this, unless he had the property which he could convey to and vest in the purchaser? He must have it absolutely and not upon condition to sell if needful for the payment of debts; for who could know, when he inclined to become a purchaser, whether such necessity existed or not ? Must a purchaser take an account of all the partnership dealings, *756 and ascertain exactly all the debts due and the state of the funds in the hands of the survivor wherewith to make payment ? Then the survivor must have power to sell absolutely and unconditionally. He must of course have an absolute and unconditional property and dominion over all the estate belonging to the partnership, which was capable of sale, including both lands and personal estate. He must have to him and his heirs a fee simple estate. He was liable, however, to account for the value of all to the executors of the deceased, and to pay them the deceased’s share of the balance appearing, after justly accounting for the full value of all.”
The Court say, thus stood the law till act of 1784. What then is the law since the act? “The same as before except in one single instance, operated by the word heirs used in the clause we are investigating. It must have a meaning assigned to it. Had it not been for the proviso, the enacting clause to which it was annexed would have destroyed the survivorship in the case of partners, and introduced all the mischief and confusion that system is calculated to avoid. The main object of the proviso was to except this case out- of the statute. But in making the proviso, or exception, the Legislature thought proper to save to the heirs at law, such part of the value of the real estate vested in the survivor and his heirs, which should remain unexhausted by the payment of debts, and therefore inserted the word heirs to give them a title to such moneys. In the same spirit, the word heirs is here introduced to save the produce, that is *757 price if sold, (not profits,) of the real estate for the heirs, which but for this word would go to the executor of deceased partner.”
The property in the survivor remains, till the partnership be settled, and all sales by him in meantime are valid. “ Suppose, however,” say the Court, “ the words ‘ all such part, share and sums of money ’ refer to stock composed of lands and personalty as remains unsold and unexhausted by the payment of debts, will be divisible, and go pro rata to the representatives of the deceased; that is to say, the realty to the heirs, and the personalty to the executors.” The case in 6 Yerg., 21, does not contravene this view, but expressly adopts it. So in case of Barcroft v. Snodgrass, 1 Col., 445.
The principle of the cases is, that real partnership property vests in the survivor absolutely, until the partnership affairs are wound up, and he may sell the same, (no collusion or fraud being in the case,) whether the sale shall be demanded for payment of debts or not, and purchaser would get a good title. Should he sell, the proceeds of such sale, after payment of debts, go to the heir as the real representative, and not to the administrator or executor. If stock remain on settlement of the partnership, both real and personal, the realty goes to the heir, the personalty to the administrator or executor.
We have cited this case at length in order to fix' the time when the right of the heir attaches. It can not be immediately on death of ancestor, the partner, for, if so, then the surviving partner is authorized to *758 sell absolutely, without assent or authority from the owner, his land, and convey a good title. The word then in opinion of Court, in 3 Hayw., 97, 98, serves to indicate the time — that is, what remains after payment of debts and settlement of the partnership. “Then only such parts of them” — that is, the personalty or realty, as remain unsold and unexhausted by the payment of debts, will be divisible, and go pro rata to the representatives of the deceased — that is to say, “the realty to the heirs, and the personalty to the executors.”
Assuming this to be the law, or correct exposition of these opinions, it follows that the surviving partner, in continuing to use the mill, was using that .which he held the legal title to, until settlement of the debts of the partnership, and its affairs wound up and settled. That the profits made in such use is personalty to be accounted for to the administrator, and not in nature of realty. Nor is it rents derived from realty of heirs’ estate, but profits made by surviving partner in continuance of the business of the firm, which he holds as trustee, first for payment of firm debts, then for representatives of deceased — that is, the mill and lands for heirs, and its profits, being personalty produced by the surviving partner (there remaining a surplus after paying debts) at time of winding up and settling estate, to administrator.
As the right or title of the heir only attaches after winding up and settlement of estate by the surviving partner, we hold that he takes only that to which his title is fixed at this period — that is, to the *759 land, or its proceeds, if it has been sold-vbut that the profits were personalty, accruing in the hands of surviving partner, and, being personalty and not land, goes to administrator to be appropriated to payment of debts of ancestor.
This being so, the first account to be settled will be to ascertain the state of the partnership at the death of W. C. Northcutt. For this purpose an account must be taken to show the amount of assets, including the realty of the firm at that time, and also the amount of debts due by said firm, and, after this is ascertained, then the surplus, if any, after debts are paid and partnership settled, would be subject to division between the surviving partner and the personal and real representatives of W. 1C. Northcutt.
As the mill was kept in operation by the surviving partner, in so far as the profits went to the discharge of the debts of the firm, it was a legitimate and proper use of the property, and any payments thus made will be allowed Moore in the adjustment of this account.
Moore, the surviving partner, being held to account as trustee, the next account to be taken will be the profits of the mill in the hands of Moore as surviving partner after payment of partnership debts up to the time of filing this bill. In taking this account he will be allowed as a credit all necessary and proper expenses in repairs and for running the same, such as hire of hands, etc., so as to show the clear profits each year. •
As trustee, he is held to a strict responsibility, *760 and bis conduct in discharging this trust is carefully looked after by Courts of Equity: Parsons on Part., 442. He may continue the business, but is not bound to do so; .but if he does continue it, he must account for all profits as belonging to the firm: Parsons, 443. But he is not entitled to compensation for his services in winding up the business of the firm, unless' there was an express contract between him and his co-partner in his lifetime that the partner was to have compensation, and then this agreed compensation might be allowed for like service rendered after his death: 1 Head, 94, 95.
No such agreement existed in this case, however.
Mrs. Mahala Northcutt, the widow, on the death of. her husband, was entitled to dower in the real estate of which he died seized, and to the property exempt from execution by law, for herself and children, and to a year’s support for herself, and family.
An account will be taken, to ascertain what such year’s support at, the time would have amounted to, and as she received the profits of the mill for about a year, and there was no Court to which she could go in order to have this year’s support assigned to her, she having received it without such assignment, her administrator will be charged with any surplus she may have received of profits of mill over and above such year’s support — that is, she will be held liable for same, and he responsible, provided he have assets to meet the same; and if after her death the property to which she was entitled as widow, went *761 into the hands of Jno. M., he will account to her administrator for the same.
Her son Peyton, having died before her, unmarried, she or her administrator is entitled to share equally with his brothers and sisters, in any of the personalty to which his administrator may be entitled, after payment of his debts, existing at his death.
Moore, in his cross bill and answer, claims that he has more than paid the notes given for the land, by the fact that the excess of profits received by W. C. Northcutt in his lifetime, and the amount received by the widow after his death, and the amount received by Jno. M. since death of his mother, and some payments of debts of W. C. Northcutt, together with a note or notes which he claims to hold on said W. C., will more than make up the amount due on said notes. Can this be allowed?
We hold it can not to the extent claimed. As to the amount received by Mrs. Northcutt, the widow, so far as the value of her year’s support for herself and family goes, it was a proper charge on the estate, and to this extent he will have a credit in the account to be taken between him and Jno. M., the administrator, as money paid for benefit of the estate, and by her properly received from said estate, and also, any amount thus received of the profits by the widow, which she applied to the payment of the debts of W. C. Northcutt. These sums shall be allowed him as credits in settlement with Jno. M., the administrator, as if received directly by said administrator; for if the administrator should collect it from Moore, or *762 he not be allowed a credit for it, the estate would get the benefit of it twice — once as payment to the widow and to the debts, and also from Moore. He will also be allowed in settlement with the administrator of W. C. Northcutt, any debts due him from W. C. Northcutt in his lifetime, or paid by him since for the administrator, provided said debt so paid was a debt of W. C. Northcutt, or a legitimate charge on the estate incurred by administrator.
As to the excess of profits received by Jno. M. before his administration and after the death of his mother, so far as they may have paid any debts of his father, they are a proper credit to Moore, as paid in discharge of a liability of the intestate of Jno. M., and which he could properly have paid, and may be charged as received by the administrator of W. C. Northcutt.
As a matter of course, all that has been received by Jno. M. since his appointment as administrator, is properly received by him, and so far is to be accounted for by Jno. M., as administrator, in his settlement with Moore.
Moore then stands indebted to administrator of W. C. Northcutt for the notes given for the land, and is to account with said administrator for profits of the mill. The share of Moore in said profits, after discharging all proper charges against the mill for repairs, expenses of running, etc., and of Jno. M. as administrator of W. C. Northcutt, will be ascertained by a proper account between the parties, in which Moore will receive the credits hereinbefore indicated. The *763 balance between the administrator and Moore will then be ascertained.
An account then will be taken to see how much remains due on notes given for the land, and if any balance has been shown ip favor of Moore against the administrator, then he will be credited with it on notes, and the administrator charged, and balance of notes, if any, will be decreed to be paid by Moore, or his interest in the mill property will' be sold to pay the same.
Jno. M. Northcutt must, as administrator, account for all profits received by him, after a balance is struck between him and Moore, on the principles above stated, and in settlement of his accounts, will be entitled to credit for all debts of his father paid by him, and necessary expenses of the administration; that is, all received after his appointment. As to so much as was received before, as Moore is compelled to account for it, Moore will be entitled to a decree against Jno. M. individually,, for so much of the profits thus received by him, and which can not be shown to have gone in payment of proper charges on the estate.
Jno. M. will be entitled to reasonable compensation, as between him and Moore, for his services up to time of administration; after that, will but be allowed compensation as administrator for attention to the interest of the estate in the mill, as for other services rendered as administrator. He will be chargeable as administrator for all sums received by him from the mill after his appointment, and will be entitled to credit for proper appropriation of the fund in payment *764 of bis father’s debts, already paid. He will pay any other debts due, or an account may be directed to ascertain how much remains due, and the same paid under the direction of the Court at Dresden.
When the debts are paid; and these accounts are all taken, then the distribution of the surplus will be directed by the Chancellor, complainants and other distributees being entitled to their share of the personalty remaining, from the administrator. He will be entitled to a credit with the distributees for so much as he can show he has actually paid for necessaries for them — no more.
The administration of the estate will -be conducted under the direction of the Court of Chancery at Dresden, and the bill retained in that Court till the estate is wound up and settled.
As to the matter of the saw-mill, as heirs get the benefit of this, Moore will be allowed the cost of its erection so far as paid, and the balance due, if any, will be paid out of profits of mill, and then profits of saw-mill will be accounted for as the grist-mill in the general account.
' The question of the real estate, as to whether it shall be sold in order to wind up the partnership, or for partition between heirs and Moore or his as-signee, will be left to the Chancellor for future action as well as the management of the mill — that is, whether it shall be rented out or placed in the hands of a receiver.
The case will be. remanded to Chancery Court for faking of the accounts herein ordered, and such others *765 as may be found necessary, if any, to final settlement of the estate, and for administration under the direction of the Chancellor.
The costs of this Court will be paid by Jno. M. Northcutt and Moore. Costs in Court below to be decreed by Chancellor.